IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ANDREA G. C.,[1]            )
                            )
         Plaintiff,         )
                            )
vs.                         )  Civil No. 18-cv-1136-CJP[2]
                            )
COMMISSIONER OF SOCIAL      )
SECURITY,                   )
                            )
         Defendant.         )

## **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for benefits in July 2014, alleging she became disabled as of July 24, 2012. After holding an evidentiary hearing, ALJ Susan Smoot denied the application on May 17, 2017. (Tr. 16-31). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 14.

1

## Issue Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ erred in weighing the opinion of plaintiff's treating neurologist.

2. The ALJ failed to properly include limitations arising from migraine headaches in the RFC assessment.

3. The ALJ erred in assessing the statement of plaintiff's daughter.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. The standard for disability under both sets of statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three and cannot perform his or her past work (step four), the burden shifts to the Commissioner at

step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). However, while

judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Smoot followed the five-step analytical framework described above. She determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date. She was insured for DIB only through December 31, 2014.

The ALJ found that plaintiff had severe impairments of obesity, degenerative disc disease of the cervical, lumbar, and thoracic spine, and migraines, which did not meet or equal a listed impairment.

The ALJ found that plaintiff had the following residual functional capacity (RFC):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps and stairs and occasionally climb ladders, ropes or scaffolds. She can occasionally stoop, kneel, crouch and crawl. She must avoid concentrated exposure to loud noise, fumes, odors, dust, gases and poor ventilation. The claimant must avoid concentrated exposure to moving mechanical parts and unprotected heights.

The ALJ found that plaintiff could not do her past relevant work as a line operator supervisor or a line worker. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because she was able to do other jobs that exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.

1. **Agency Forms**

Plaintiff was born in 1971 and was 41 years on the alleged date of disability. (Tr. 217). She said she was 5'4" tall and weighed 220 pounds. She had completed the ninth grade. She had worked as a line operator in a food factory. (Tr. 220-222).

In a Function Report submitted in September 2014, plaintiff said she suffered from chronic daily headaches that did not respond to medication. (Tr. 245).

Plaintiff's adult daughter, Rebecca Warchol stated in a Function Report that plaintiff was "unable to do simple tasks when having a headache." She had to lay down. Her headaches lasted days and sometimes a week. Plaintiff did housework if she was able to, but "if headache comes she has to lay down." Ms. Warchol helped plaintiff with cooking and laundry when plaintiff was not able to do it. Ms. Warchol wrote, "Even though she can do some things, she can never know when the headache will occur or for how long it will last. I have to stay with her to help with daily activities when she isn't able to her herself. I worry I may have to quit my job to help her when her headaches come on since all she can do most days is lay in bed." (Tr. 257-264).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in April 2017. (Tr. 42).

Plaintiff lived with her children, who were 13 and 5 years old. (Tr. 44).

Plaintiff testified that she could not work because she "started getting massive headaches in 2011." Her neurologist put her on Topamax, which helped a little, but had no effect after a while. She tried over-the-counter medications. She took Propranolol, which helped her blood pressure, but she still had headaches. She went to the emergency room for headaches a couple of times. The only thing that really worked was morphine. (Tr. 49-52).

When plaintiff gets a bad headache, she is "confined to a room with silence and a fan." Her 26-year-old daughter would come and take care of her children. The older daughter helped whenever she needed it, doing laundry, cleaning the house, and cooking meals. Plaintiff averaged two to three "bigger" headaches a week. (Tr. 52-64). She was unable to do her household chores when she had a headache. She said the "chances are very slim" that she could go without missing at least two days a month from a job due to headaches. (Tr. 64).

Plaintiff testified that she also had problems with her upper and lower back, and the left side of her neck. (Tr. 54).

A vocational expert (VE) also testified. The ALJ asked him a hypothetical question which corresponded to the RFC assessment. The VE testified that this person could not do plaintiff's past work, but she could do other jobs that exist in the national economy. (Tr. 68-69). He also testified that a person who missed work on two or more days a month would be unemployable. (Tr. 71).

3. **Relevant Medical Records**

Plaintiff saw Dr. Trivedi, a neurologist, in May 2013 for evaluation of

7

headache. She said she had been having daily headaches for six months. She described the headaches as "debilitating and pressure." Her physical exam was normal. The assessment was chronic daily headaches, likely from depression or stress related. He prescribed Amitriptyline (Elavil). (Tr. 360-362).

Dr. Trivedi saw plaintiff three more times in 2013. He prescribed Topamax. (Tr. 363-365, 370-374, 382-384).

When plaintiff returned in February 2014, she said her headaches were getting worse even though the dosage of Topamax had been increased. Dr. Trivedi ordered an MRI and instructed her to taper off Topamax and to start Propranolol, a beta-blocker. She was also to keep a blood pressure journal. (Tr. 366-369). In April 2014, she reported that she continued to have daily headaches. A previous MRI from January 2013 showed hyperintensities in subcortical white matter in parietal areas. The new MRI showed no changes. Dr. Trivedi instructed her to continue Propranolol for hypertension and to restart Topamax. He ordered a sleep study. (Tr. 378-381). The sleep study showed moderate sleep apnea. (Tr. 390).

Plaintiff went to the emergency room in August 2014 for a headache lasting for four days. She was given an injection of Hydromorphone HCL (Dilaudid) and was discharged in improved condition. (Tr. 450-469).

In October 2014, plaintiff told Dr. Trivedi that her headaches were intermittent, and she had two emergency room visits since July 2014. She said she had twenty-two headaches since August 2014. She had "self-titrated" her medication, decreasing the dosage of Topamax and not taking Propranolol as

prescribed. Dr. Trivedi explained the role of preventative therapy and breakthrough pain medications, and the "realistic goal of headache treatment." He noted that she may have some breakthrough headaches, but that did not mean that her medication was not effective. Further, too many analgesics could cause rebound headaches. She was to restart Propranolol and Topamax, and to try Indomethacin for breakthrough pain. (Tr. 814-817).

In March 2015, plaintiff reported that her headaches were better, but she was having mood swings and wanted to stop Topamax to see if that was the cause. (Tr. 813). Her headaches got worse, so Topamax was restarted in May 2015. (Tr. 807). In August 2015, her headaches were getting better, but she was having cognitive issues. The dosage of Topamax was decreased. (Tr. 796-801). In December 2015, her headaches were "fluctuating." Her headache was "now day 8 mild dull pain." She was taking ibuprofen for neck pain. Prednisone was ordered for her head and neck pain. Dr. Trivedi instructed her to stop taking ibuprofen due to analgesic rebound pain and to take Aleve for all kinds of pain. She was to continue taking Topamax. (Tr. 789-794).

Plaintiff's last visit with Dr. Trivedi was in June 2016. She was having 15-16 headaches a month. She said she was taking Topamax regularly. Her hypertension was "acting up" so Propranolol was restarted. Because Dr. Trivedi was leaving the office, she was to be referred to another neurologist. (Tr. 781-786).

Plaintiffs saw Dr. Tiffany Ward, a neurologist in Dr. Trivedi's former office, in February 2017. Dr. Ward's impression was chronic intermittent frequent headaches since giving birth five years earlier. Her headaches were sometimes

9

sudden in onset and sometimes required visits to the emergency room. Dr. Ward instructed plaintiff to restart Propranolol and filled out "SSI paperwork." (Tr. 775-780).

Plaintiff also complained of headaches to an orthopedic specialist who saw her for neck pain in March 2016. (Tr. 581). In September 2016, she complained of headaches to her primary care physician. (Tr. 626). She complained of chronic headaches again to an orthopedic specialist in October 2016. (Tr. 647).

### 4. Dr. Ward's Opinion

On February 20, 2017, Dr. Ward completed a form assessing plaintiff's RFC. (Tr. 819-823). Dr. Ward indicated that plaintiff was able to work an 8-hour day and that she was able to stand, walk, and sit for 8 hours each in a work day. However, she needed an opportunity to lie down or recline for 20 minutes every 3 hours. She was able to frequently lift up to 100 pounds. Dr. Ward indicted that plaintiff had headaches 4 to 5 days a week, and she would be likely to miss work 2 or more days a month because "She has frequent headaches. Some are incapacitating." Dr. Ward stated that her disagnosis was not based on any tests or examination results.

## Analysis

Plaintiff's first point challenges the AJL's consideration of Dr. Ward's opinion.

Although Dr. Ward treated plaintiff, the ALJ was not required to fully credit her opinion because of her status; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91

F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). A treating source's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff's application was filed before March 27, 2017. The applicable regulation, 20 C.F.R. § 404.1527(c)(2), provides, in part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

If the ALJ decides not to give the opinion controlling weight, she is to weigh it applying the factors set forth in § 404.1527(c)(1)-(6). Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010).

Here, the ALJ said she gave "some weight to the opinion from the treating

11

physician since it was not consistent with the record as a whole. The probative evidence showed the clamant did have some limitations in her functioning due to her neck and back pain, in particular her ability to lift." (Tr. 28). In the next paragraph, the ALJ said, "Nevertheless, Dr. Ward concluded the claimant was able to sustain competitive employment. This opinion from the neurologist contradicted the claimant's assertion that her headaches precluded her from working." (Tr. 28).

Plaintiff argues that the ALJ ignored the part of Dr. Ward's opinion in which she stated that plaintiff would be likely to miss work two or more days a month due to headaches. However, as defendant argues, the ALJ went on to state, "the treatment record did not support [plaintiff's] assertion that her headaches were occurring frequently, and preventing her from maintaining consistent employment." (Tr. 28).

In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The Court finds that ALJ Smoot easily met the minimal articulation standard here. Giving the decision a commonsense reading, it is clear that the ALJ rejected Dr. Ward's opinion about plaintiff missing work due to headaches because it was contradicted by the treatment records. Notably, plaintiff does not argue that the ALJ ignored or misconstrued the treatment records. Further, Dr. Ward stated that her diagnosis was not based on any test or examination results. An ALJ is not

required to accept a medical opinion that is based on the claimant's subjective complaints. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

Plaintiff's second point is a nonstarter. She argues that the RFC assessment does not account for her headaches. Again, the ALJ determined that the treatment record does not support her claim that her headaches preclude her from working, and plaintiff does not argue that the ALJ ignored or misconstrued the treatment records.

Lastly, plaintiff takes issue with the ALJ's handing of her adult daughter's statement. She argues that the ALJ distorted her statement by characterizing her as saying that plaintiff "had difficulty performing activities when having a headache" and "had difficulty performing simple tasks when experiencing a bad headache." (Tr. 26). Plaintiff argues that her daughter actually said that she was unable to perform activities, not that she "had difficulty." However, this semantic argument ignores the ALJ's rationale for giving the statement only "some" weight.

The ALJ explained that the daughter's statement indicated that plaintiff was able to regularly engage in a number of daily activities, including caring for her young children, cooking meals, cleaning the house, shopping, watching tv and reading, going for walks, and managing the household finances. The ALJ concluded that the ability to perform this array of activities was inconsistent with her claim that she was unable to work outside the home. Further, the ALJ pointed out that the treatment records showed that plaintiff did not always take her medication as directed and that her headaches improved when she did so. She also pointed out that plaintiff did not see a neurologist for headaches between June

13

2016 and February 2017, which contradicted her claim that that her headaches were severe enough to prevent her from working.

This is not a case in which the ALJ failed to discuss evidence favorable to the plaintiff or misconstrued the medical evidence. Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. She has not identified a sufficient reason to overturn the ALJ's conclusion.

Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d at 413.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Smoot committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is AFFIRMED.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE: March 18, 2019.**

                                         **s/ Clifford J. Proud**
                                         **CLIFFORD J. PROUD**
                                         **U.S. MAGISTRATE JUDGE**